TERRENCE JAMAL WILLIAMS,

                    Petitioner,                       Case No. 1:13-cv-14493
                                                      Honorable Thomas L. Ludington

v.

STEVEN RIVARD,

                    Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner, Terrence Jamal Williams, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. Petitioner is incarcerated at the Muskegon Correctional Facility in Muskegon, Michigan. He challenges his convictions for first-degree premeditated murder and assault with intent to murder. Respondent, through the Attorney General's Office, has filed an answer in opposition to the petition. For the reasons set forth below, the petition will be denied, as will a certificate of appealability and leave to appeal in forma pauperis.

## I.

Petitioner's convictions arise from a May 15, 2007 shooting, which resulted in life-threatening injuries to Jerrance Lewis ("Lewis") and in the death of Carl Hairston ("Hairston"), outside of the Perfect Beat nightclub on Fort Street in Detroit ("Perfect Beat shooting"). That evening, Hairston drove his mother's Chevy Tahoe to the Perfect Beat Night Club, along with his friends Lewis and Thomas Cook ("Cook"). The Michigan Court of Appeals described the underlying facts, which are presumed to be correct on habeas review, *see* 28 U.S.C. § 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

[Hairston, Lewis, and Cook] left the [Perfect Beat] shortly before closing, reentered their vehicle and traversed Fort Street in front of the club for several minutes while listening to loud music. Williams (then age 20) approached the Tahoe from behind while driving a light blue minivan. Williams pulled parallel to the driver's side of the Tahoe. The rear, passenger-side sliding door of the minivan opened and Green (then age 22) fired more than 20 shots from an AK–47 at the Tahoe. The minivan collided with the Tahoe and the minivan's door was torn off in the fray. Hairston was struck with several bullets and was pronounced dead on arrival at the hospital. Lewis was shot numerous times in the abdomen and side, required three surgeries to repair internal damage, and was hospitalized for a month. Cook escaped unharmed. He fled the scene and was only secured as a trial witness through the significant efforts of the prosecutor and law enforcement officers.

Investigating officers soon received an anonymous tip that "Joe Green" was involved in the shooting, but they were unable to locate any suspects on that information alone. Investigators then discovered a burned minivan, missing its sliding rear door, abandoned in a field. The door recovered on Fort Street perfectly matched the minivan. The officers traced the vehicle's identification number and learned that it was registered to Juanita Williams, the mother of [Petitioner] and defendant "Joe Green." When Lewis recovered sufficiently to speak to the officers, he specifically identified defendants by name as his attackers. Lewis indicated that he had seen defendants driving the minivan in the past and clearly saw their faces during the shooting. Lewis then confirmed defendants' identities through a photographic line-up.

Green and Williams had a long-standing feud with Hairston and Lewis. Lewis admitted that the two groups fought each time they met, sometimes with weapons. The parties stipulated that Williams had previously shot Lewis in the hand. Cornelius Wade, a jailhouse informant, testified that Williams confessed to the drive-by shooting while housed in the Wayne County Jail. According to Wade, a man name[d] Armond hired Williams and Green to kill Lewis and Hairston to avenge the robbery of Armond's carwash (which served as a front for a drug-dealing and gambling operation). Wade alleged that a man named Aaron Campbell was at the Perfect Beat on the night of the shooting and contacted defendants by telephone to alert them of Hairston's and Lewis's presence. The prosecution also presented evidence that someone threw a firebomb into and fired a barrage of bullets at Lewis's home the night before defendants' preliminary examination.

*People v. Williams*, No. 286097, 2011 WL 6004067, at *1–2 (Mich. Ct. App. Dec. 1, 2011). The

Detroit Police Crime Lab analyzed the ballistics evidence in the case. At the trial, Detroit Police

Officer David Pouch testified as an expert of firearms and tool mark identification. He explained

that five of the shell casings found at the scene of the Perfect Beat shooting were fired from the

same weapon and two were fired from another weapon. ECF No. 17-31 at 63. Those shell casings were also compared to the shell casings recovered from the firebombing and shooting of Lewis's home. Officer Pouch testified that five of the shell casings were fired from the same weapon as the Perfect Beat shooting.

Petitioner and Green were tried jointly at a 24-day jury trial in Wayne County in 2008. They both asserted alibi defenses. Additionally, Petitioner "presented evidence from his friends Jamaal and Jameel Croft, who claimed to have been standing outside the Perfect Beat at the time of the shooting, and asserted that the minivan's occupants were heavy-set Mexican or Caucasian men." *Id.* at 2. Petitioner and Green also attempted to establish that the minivan had been stolen before the shooting. The jury convicted Petitioner of first-degree premeditated murder and assault with intent to murder ("AWIM"). Thereafter, the Court sentenced Petitioner to life in prison without parole for the murder conviction and 20 to 30 years' imprisonment for AWIM.

In 2010, Petitioner, through counsel, filed an appeal raising two issues: 1) that he was entitled to a retrial based on newly discovered evidence; and 2) that the trial court violated his rights by closing the courtroom during the testimony of key witnesses. The Michigan Court of Appeals remanded the case for an evidentiary hearing to determine if retrial was necessary due to the newly discovered evidence. Specifically, the Detroit Police Crime Lab was closed in 2008 due to an unacceptable error rate, leading to an audit by the Michigan Department of State Police. Sergeant Reinhard Pope, a firearms and tool marks examiner at the Michigan Department of State Police Forensics Laboratory, testified at the evidentiary hearing. As part of the audit of the Detroit Police Crime Lab, he examined the ballistics evidence from the Perfect Beat shooting and from the shots fired at Lewis's home. Sergeant Pope's analysis revealed that only three of the bullets had been fired from the same firearm at the Perfect Beat shooting. When he compared those bullets

to those found at Lewis's home, he concluded that he could not "identify or eliminate them as having been fired from the same firearm," as the Perfect Beat shooting, thus contradicting Officer Pauch's testimony at the original trial. ECF No. 17-42 at 33. The trial court denied Petitioner's motion, concluding that the discrepant ballistic evidence would not make a different result probable on retrial.

The Michigan Court of Appeals affirmed Petitioner's convictions. *Williams*, 2011 WL 6004067 at 14. Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims raised in the Michigan Court of Appeals. The Michigan Supreme Court denied leave to appeal. *People v. Williams*, 491 Mich. 921 (2012). The Michigan Supreme Court later denied a motion for reconsideration. *People v. Williams*, 492 Mich. 859 (2012). Petitioner then filed a motion for relief from judgment, which was also denied. *People v. Williams*, No. 07-010617-02-FC, Wayne Cir. Ct. Opinion and Order (July 23, 2013). Thereafter, Petitioner filed the instant petition for habeas relief, and obtained a stay to exhaust additional issues in the state courts. He filed an amended petition on December 15, 2014, raising the following claims:

I.      A new trial is warranted due to newly discovered evidence;

II.     The trial court violated his Sixth Amendment rights by closing the trial    to    the public and allowing witnesses to face away from him as they testified;

III.    Trial counsel was ineffective;

IV.     The trial court lacked jurisdiction; and

V.      Appellate counsel was ineffective.

**II.**

The petitioner's claims are reviewed against the standards established by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). The AEDPA provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an    unreasonable application of, clearly established Federal law, as    determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable      determination of the facts in light of the evidence presented in the  State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (*quoting Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (*quoting Williams*, 529 U.S. at 413). However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520–21 (citations omitted). *See also Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

Put another way,

Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal . . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 786-87 (internal quotation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams,* 529 U.S. at 412. Section 2254(d) "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007), *citing Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

Lastly, a federal habeas court must presume the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### III.

### A.

Petitioner first argues that he is entitled to a new trial on the basis of newly discovered evidence as a result of the Michigan State Police Crime Lab's re-examination of the ballistics evidence. The Michigan Court of Appeals addressed this issue as follows:

We agree with the trial court's conclusion that the reanalysis of the ballistic evidence was newly discovered, noncumulative evidence that could not have been discovered before the first trial. We also agree with the trial court that the new ballistic evidence would not make a different result probable on retrial. Williams inaccurately argues that the debunked ballistics evidence was a cornerstone of the prosecutor's closing argument. In reality, the prosecutor's reference to the shell casings' commonality was a brief portion of her 47–page closing argument. The thrust of the prosecutor's argument was that the witnesses supporting the prosecution theory testified consistently regarding the details of the crime and their testimonies were corroborated by the physical evidence. The physical evidence was not limited to the debunked ballistic analysis; it included the location and number of shell casings found at the scene, the trajectory of the bullets compared to the position of the victims' bodies, the minivan door left in the middle of Fort Street, and defendants' mother's burned minivan found abandoned in a field. The witnesses supporting the defense theory, on the other hand, could not agree on the details surrounding the shooting and gave incredible, fluctuating accounts.

Moreover, the prosecution did not need to conclusively prove that the shell casings found at the Perfect Beat and Lewis's home were fired from a single weapon to make its point. The jury could reasonably infer that the timing of the firebombing was not a coincidence and was orchestrated to prevent Lewis from testifying at the preliminary examination. Given Lewis's consistent identification of defendants as the perpetrators from the moment he awoke after surgery, Ware's testimony regarding Williams' jailhouse confession,[1] defendants' undeniable connection to the van, the timing of the firebombing, and the incredibility of the testimony given by Tracey George and the Croft brothers, a different result on retrial is improbable. Therefore, the trial court did not abuse its discretion in denying Williams' motion.

*Williams*, 2011 WL 6004067 at 4 (internal citation and quotation omitted).

Petitioner's argument that he is actually innocent based upon the newly analyzed evidence is not cognizable on federal habeas review. *Hence v. Smith*, 37 F. Supp. 2d 970, 980 (E.D. Mich. 1999). "A claim that a habeas petitioner is entitled to relief based upon the failure of a state trial judge to grant him a trial on the basis of newly discovered evidence is not cognizable in a habeas proceeding." *Monroe v. Smith*, 197 F. Supp. 2d 753, 763 (E.D. Mich. 2001) (citing *J.C. Dickey v. Dutton,* 595 F. Supp. 1, 2 (M.D. Tenn. 1983)). Accordingly, Petitioner does not state a claim upon which relief can be granted.

---

[1] Cornelius Ware is a jailhouse informant who was incarcerated with Petitioner at the Wayne county Jail.

Even if the claim were cognizable, the Michigan Court of Appeals' analysis of this issue was reasonable. Motions for a new trial based upon newly discovered evidence, even on direct appeal, "are disfavored and should be granted with caution." *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000). When a defendant moves for a new trial based on newly discovered evidence, he or she must show that the evidence: 1) was discovered after the trial; could not have been discovered earlier with due diligence; 3) is material and not merely cumulative or impeaching; and 4) would likely produce an acquittal if the case were retried. *United States v. Turns*, 198 F.3d 584, 587 (6th Cir. 2000). Here, the trial court reasonably concluded that Petitioner failed to meet the fourth prong of the test because of the ample, non-ballistic evidence against him, including eyewitness testimony corroborated by other physical evidence. Petitioner has not demonstrated that the Michigan Court of Appeals' dispensation of this matter is unreasonable and therefore he is not entitled to habeas relief on this claim.

## B.

### 1.

Petitioner asserts that the trial court violated his Sixth Amendment right to a public trial by closing the courtroom during the testimony of two key witnesses, Lewis and Ware. Lewis was injured in the passenger seat of the Chevy Tahoe on the night of the shooting and testified for four days during the trial. During his testimony, he identified Petitioner and his co-defendant as the shooters. He also testified that he and Hairston had a long-standing grudge with the co-defendants, which had erupted into violence in the past. Ware testified as a jailhouse informant, contending that Petitioner spoke to him about his case, specifically, that a man paid Petitioner and his brother to "take care of" Hairston. ECF No. 17-22 at 96.

The Michigan Court of Appeals accurately described the incidents leading up to the courtroom closure as follows:

> Throughout the proceedings "emotions ran high." The attorneys squabbled and threatened each other and showed disrespect to the trial judge. The courtroom was filled with antagonistic spectators with rivalries of their own. On the second day of witness testimony, the prosecutor indicated that Cook was frightened of certain spectators in the courtroom and did not want to testify. The court declined the prosecutor's request to clear the courtroom because Cook declined to identify the specific spectators that caused his fear and the court observed no "overt attempt to influence" his testimony.
>
> The prosecutor renewed her request the following day, explaining, "In the witness room, I spoke with [Cook] about his concern testifying in this courtroom. He indicated that he did not want to testify. He has to go back to that neighborhood, and he knows the people in the courtroom . . . ." Cook then took the stand and altered his testimony from the statements he had previously made to the police. Specifically, Cook suddenly denied seeing the blue minivan during the shooting. The prosecutor opined, "The only thing that I can garnish from that is that the people in the back row are the people he knows from that neighborhood[.] The back row was the individuals that Mr. Cook indicated were people he didn't want to testify in front of."
>
> That same day, the prosecutor observed defendants' step-grandfather (G.Johnson) coaching Tracey George regarding her demeanor on the stand and the content of her testimony. The prosecutor summarized the conversation she overheard as follows:
>
>> I then hear him saying to her, you need to say this. You didn't sign this. And she called you a liar, and you need to say, this man is seated in the courtroom telling the witness what to say on a break. That's tantamount to witness tampering.
>
> The court instructed G. Johnson not to tamper with the witnesses.
>
> Two days later, G. Johnson violated the court's instructions and coached Juanita Williams regarding her testimony. A member of Hairston's family, later identified as E. Smith, overheard G. Johnson instruct Juanita regarding her demeanor and tone on the witness stand. In response, attorney Price informed the court that E. Smith was Hairston's brother and that he had been "shooting nasty glances" at another spectator in the courtroom.
>
> Another four days later, attorney Price informed the court that a specific spectator had been "making gestures and mouthing words" to a witness who was testifying on the stand. Attorney Price further accused the spectator of "being too demonstrative to the jury."

The following day, the court finally had enough. As the jurors were exiting for a break, Lewis queried to prosecutor Towns, "You see that?" The following heated discussion occurred:

> *Ms. Towns.* I did see that. Yeah, I did see that with Mr. Price looking at the witness.
>
> *[Lewis].* Telling me I'm dead and all this.
>
> *Ms. Towns.* Wait a minute. I've been watching him during the trial. These witnesses—
>
> *Mr. Green.* They just making that little n* * * * * lying.
>
> *[Attorney] Johnson.* Hey. Hey. Hey.
>
> *[Lewis].* Get the f* * * on. What you talking about, boy? Get on.
>
> *Court Oficer.* Have a seat. Have a seat. Have a seat.
>
> *Ms. Towns.* Mr. Lewis, you're all right, don't let these people get to you. You should be ashamed of yourself.
>
> *Mr. Price.* You should be ashamed of yourself. You don't know what you talking about.
>
> *[Lewis].* I know you 'bout to get—
>
> *Mr. Price.* How you gonna play me? He ain't no boss of nothing.

The court then forced a break to reduce the tension in the courtroom.

Upon reconvening, the prosecutor indicated that she spoke with the then 16–year–old Lewis that morning regarding his demeanor on the stand.

> He asked me, "Why is that guy griming me?" [2] From other references in the transcript, we assume the prosecutor accused attorney Price of "grimming" Lewis, not "griming." To "grim" means "to get smart with or show attitude." <http://www.urbandictionary.com/define.php?term=grim> (accessed November 15, 2011).
>
> And he pointed right at Mr. Price . . . .

<center>*     *     *</center>

And again, he pointed right at Mr. Price. I said, "Don't look at him, just look where you need to look, testify, tell the truth, end of story." That sort of keyed me on to watch Mr. Price's expressions towards this witness during his testimony. There were at least three times I can count where I almost objected to approach the bench to draw the Court's attention to it. But I thought you know what, I'm just gonna wait for a while.

At one point while he was testifying, my victim's family in the back started saying things to me[.] I could hear them saying, "Look at him, look at him."

At that point, I just turned my head and I watched Mr. Price. And I have been doing this going on 16 years, and I know what a quote/unquote "grim" look looks like. I'm telling the Court I watched him engage in witness intimidation with a 16 old [sic] witness on the stand. He was staring him down. He was cocking his head sideways. He was looking him up and down. He was griming my 16–year–old witness.

Now, it's painful enough that the Court has to admonish people in the audience to not engage in witness intimidation, but when the lawyers are sitting here doing it, it's offensive and reprehensible.

Attorney Price denied any nefarious intent and asserted his "right to study a witness while that witness testifies." Yet, he stated, "I can have any kind of look on my face I want." Even after the court chastised Price, he indicated, "I'm gonna continue to scrutinize this guy here . . . and I'm gonna continue to look at him and I don't see why I can't look at him."

The court ultimately indicated that "passions" amongst the lawyers were "running much higher than almost any other case I've had ... they have to get under control." The court continued:

The emotions are high in this case. I have had to admonish two people in the back row already. I have had to admonish one person in the second row. And I do believe that these people have been separate [sic] by—I guess, you know, their support for who they are, I have no idea.

*     *     *

But at the time I did the admonishment, which was last week, okay, and now we just had another outburst and I have been approached for security reasons that this is getting much too intense . . . . [W]e're having to refer to people who are watching this as opposed to just based upon the witnesses here in the courtroom and the legal

arguments of the attorney. We're dragging these people into it all the time as to whether or not someone's talked to someone else and this has to stop. It has to absolutely stop.

And for the rest of this day, this courtroom is going to be cleared for security reasons. It was chaos when I left here. I don't know if I'm going to do this for the remainder of the entire trial, but I know I'm doing it for today. And it is solely for security. Emotions are flying way out there and there's reactions to what happens here between witnesses, defendants—I mean, I hear the defendants, they're upset. I heard the witness, he's upset. And I saw people in the back row upset.

So that's the rule for the rest of this day and we'll revisit the issue when it comes up for the next day of trial.

The courtroom remained closed throughout the rest of Lewis's testimony. Ware testified immediately after Lewis and the court officer refused the public entrance into the courtroom at that time. The trial judge was not initially aware of the situation. However, she later learned from the court officer that the courtroom had remained clear of spectators because Ware was a convicted felon who had been transferred on writ from prison to the courtroom. The trial judge agreed with her court officer that the courtroom should remain closed during Ware's testimony for this security reason.

*Williams*, 2011 WL 6004067 at *5–8.

The Court of Appeals noted that Petitioner's counsel had not made a contemporaneous objection to the closure and went on to review the claim for plain error, concluding that the court made findings sufficient to properly enter a closure order, and narrowly tailored the closure to only exclude spectators during Lewis and Ware's testimony. Respondent asserts that this issue is procedurally defaulted because Petitioner failed to make a contemporaneous objection to the courtroom closure. In the alternative, Respondent argues that the claim fails on the merits.

When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is barred unless petitioner can demonstrate "cause" for the default and actual prejudice from the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722,

750 (1991). If a petitioner fails to show cause for his or her procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray,* 477 U.S. 527, 533 (1986). However, in an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier,* 477 U.S. 478, 495–96 (1986). Such a claim of innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo,* 513 U.S. 298 (1995).

Petitioner asserts that any default is excused because his trial attorney was ineffective for failing to make timely objections. Attorney error can constitute cause to excuse a procedural default only if it rises to the level of constitutionally ineffective assistance of counsel under the standard set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). Analyzing whether an attorney's failure to raise or preserve claims constitutes ineffective assistance requires an analysis of the merits of the claims a petitioner asserts should have been, but were not, raised or preserved. While the procedural default doctrine precludes habeas relief on a defaulted claim, it is not jurisdictional. *Trest v. Cain,* 522 U.S. 87, 89 (1997). Judicial economy sometimes counsels reaching the merits of a claim or claims if the merits are "easily resolvable against the habeas petitioner, whereas the procedural-bar issues involve complicated issues of state law." *Lambrix v. Singletary,* 520 U.S. 518, 525 (1997). Accordingly, the Court will proceed directly to the consideration of the merits of Petitioner's Sixth Amendment claims. *See Arias v. Hudson,* 589 F.3d 315, 316 (6th Cir. 2009) (*Lambrix* permits courts to skip procedural default issues and reject claims on the merits where the merits present more straightforward grounds for decision).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. "The central aim of a criminal proceeding must be to try the accused fairly." *Waller v. Georgia,* 467 U.S. 39, 46 (1984). The public-trial guarantee was created to further that aim. *Id., citing Gannett Co. v. DePasquale,* 443 U.S. 368, 380, 99 (1979). A public trial helps to ensure that judge and prosecutor carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury. *Id.*

The violation of the constitutional right to a public trial is a structural trial error, not subject to the harmless error analysis. *Id.* at 49–50, n. 9. A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The right to a public trial, however, is not absolute. The closure of a courtroom may be justified by "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press–Enter. Co. v. Superior Court of Cal., Riverside Cnty.,* 464 U.S. 501, 510 (1984) (internal quotation omitted). Specifically, a courtroom closure does not violate the Sixth Amendment where: (1) the party seeking to close the courtroom advances an overriding interest that is likely to be prejudiced by an open courtroom; (2) the party seeking closure demonstrates that the closure is no broader than necessary to protect that interest; (3) the trial court considers reasonable alternatives to closing the proceeding; and (4) the trial court makes findings adequate to support the closure. *Waller*, 467 U.S. at 48.

Petitioner is not entitled to relief on this claim. The Michigan Court of Appeals found that the trial court made "findings specific enough that a reviewing court can determine whether the closure order was properly entered," and had "wisely balanced defendants' rights to a public trial

with the need for courtroom security." *Williams*, 2011 WL 6004067 at * 8 (citing *Waller*, 467 U.S. at 45). These conclusions are based on a reasonable application of clearly established federal law.

The trial court closed the courtroom for part of one day during a twenty-five day trial because of security concerns and the need to protect testifying witnesses. The trial testimony reveals a chaotic scene, with intense altercations between the prosecutor and defense attorneys, accusations of witness tampering and intimidation (in some cases, by a defense attorney), and at least one witness altering his testimony due to perceived threats by spectators. "[C]ourts have held that the need to protect a witness from intimidation justifies closure of the courtroom." *Nolan v. Money*, 534 F. App'x 373, 380 (6th Cir. 2013) (citing *United States v. Brazel*, 102 F.3d 1120, 1156 (11th Cir. 1997)). *See also, e.g., Presley v. Georgia*, 558 U.S. 209, 215 (2010) ("There are no doubt circumstances where a judge could conclude that . . . safety concerns are concrete enough to warrant closing *voir dire*."). Petitioner has not demonstrated that the Michigan Court of Appeals' analysis was unreasonable and therefore is not entitled to relief on this claim.

**2.**

Petitioner sets forth a second Sixth Amendment argument, asserting that the trial court violated his right of confrontation by *sua sponte* ordering Lewis to turn his chair to face the jury during his testimony. The Michigan Court of Appeals reviewed this claim for plain error because Petitioner failed to make a contemporaneous objection to the trial court's ruling. The Court of Appeals concluded that the trial court erred in ordering Lewis to turn away from Petitioner without citing any grounds for the action, but that the error was ultimately harmless because the remaining evidence was more than sufficient to support the convictions. Respondent contends that the claim is procedurally defaulted, or, in the alternative, that the claim fails on its merits. For the reasons

outlined above, the Court will proceed directly to the consideration of the merits of Petitioner's claim.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Although face-to-face confrontation is "the core of the values furthered by the Confrontation Clause," the Supreme Court has "nevertheless recognized that it is not the *sine qua non* of the confrontation right." *Maryland v. Craig*, 497 U.S. 836, 844 (1990) (internal quotation and citation omitted). Instead, the Confrontation Clause is "generally satisfied when the defense is given full and fair opportunity to probe and expose . . . infirmities, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985). As such, it is not necessary to have a face-to-face encounter in every instance in which testimony is admitted against a defendant. *Craig*, 497 U.S. at 847.

Here, the trial court *sua sponte* required Lewis to turn away from Petitioner to face the jury during his testimony. The Michigan Court of Appeals concluded that the trial court erred by making no record as to whether this action was "necessary to further an important state interest" or "to protect the witness." *Williams*, 2011 WL 6004067 at 10. However, the Court of Appeals went on to hold that the trial court's error was harmless because the remaining evidence in the case was more than sufficient to support the convictions and overcome any error.

Confrontation Clause violations are subject to harmless error review. *Bulls v. Jones,* 274 F.3d 329, 334 (6th Cir. 2001). The standard for showing harmless error on collateral review is "considerably less favorable" to a habeas petitioner than the standard which is applied on direct review. On direct review, before a federal constitutional error can be held harmless, the court must

be able to declare that the error was harmless beyond a reasonable doubt. However, the harmless-error test for collateral review is different. A federal court can grant habeas relief only if the trial error had a substantial and injurious effect or influence upon the jury's verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993). Under this standard, a habeas petitioner is not entitled to habeas relief unless he or she can establish that the trial error resulted in "actual prejudice." *Id.* Thus, a federal-habeas court can grant habeas relief only if a habeas petitioner carries the burden of showing that a Confrontation Clause error had a substantial and injurious effect or influence on the jury's verdict. *Bulls v. Jones,* 274 F.3d 329, 335 (6th Cir. 2001). The Sixth Circuit has explained that a court should consider the following factors to determine whether a Confrontation Clause error is harmless: "(1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross examination otherwise permitted; and (5) the overall strength of the prosecution's case." *See Jensen v. Romanowski,* 590 F.3d 373, 379 (6th Cir. 2009) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986)).

Here, Petitioner has failed to show that Lewis's position facing the jury when testifying had a substantial and injurious effect or influence on the verdict. Throughout his four days of testimony, Lewis repeatedly identified Petitioner as one of the assailants. His testimony was supported by Ware's statements. In addition, Petitioner's mother's burned minivan perfectly matched the door found at the Perfect Beat shooting, corroborating Petitioner's participation. Moreover, when "viewed through the deferential lens of AEDPA, the state court's harmlessness ruling must stand" because based on the record in this case, the Michigan Court of Appeals reasonably rejected any potential error in the trial court's positioning of Lewis during his testimony

as harmless error. *See Kennedy v. Warren,* 428 F. App'x 517, 522, 523 (6th Cir. 2011). Petitioner is not entitled to habeas relief on this claim.

## C.

To establish that he or she received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687.

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court's review of counsel's performance must be "highly deferential." *Id.* at 689. Habeas relief may be granted only if the state-court decision unreasonably applied the standard for evaluating ineffective-assistance-of-counsel claims established by *Strickland*. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Id.* at 123 (internal quotation omitted).

In the instant case, Petitioner argues that his trial attorney was ineffective for three reasons: 1) counsel's failure to object to the courtroom closure; 2) counsel's role in and failure to object to the trial court's repositioning of Lewis during testimony; and 3) counsel's failure to investigate the

case against him and present evidence of another shooter.  The Court will address each of these arguments in turn.

<div align="center">

**1.**

</div>

The Michigan Court of Appeals concluded that counsel was not constitutionally ineffective because any objection he could have made to the court's decision to close the courtroom would have been futile. This analysis was reasonable. The trial court made specific findings on the record that it would briefly close the courtroom to the public based on security concerns and potential witness intimidation. As addressed above, the trial transcript provides ample evidence to support the trial court's reasoning, such as reported witness tampering.

A motion to keep the courtroom open would have been futile and "failing to make a futile motion is neither unreasonable nor prejudicial." *Jacobs v. Sherman*, 301 F. App'x 463, 470 (6th Cir. 2008) (citing *Strickland*, 466 U.S. at 687). Moreover, it is reasonable to assume that trial counsel made the decision not to challenge the closure because any objection could have drawn more attention to the potential intimidation of prosecution witnesses, and may have painted his client in a bad light. *See Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (the reviewing court is "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [counsel] may have had for proceeding as they did." (internal quotations omitted)). *See also Johnson v. Sherry*, 465 F. App'x 477, 481 (concluding that counsel was not constitutionally ineffective where he "weighed the minimal benefits against the significant costs of objecting to the closure, and decided against it."). As such, trial counsel was not ineffective for failing to object to the court's brief closure to the public.

<div align="center">

**2.**

</div>

Trial counsel's behavior with respect to the court's order that Lewis face the jury during part of his testimony is a closer case, but Petitioner is likewise not entitled to relief on this claim. The Michigan Court of Appeals described counsel's performance as "unprofessional conduct" that "fueled the court's decision to reposition Lewis on the witness stand," for which the attorney could "not be deemed effective." *Williams*, 2011 WL 6004067 at *11. Specifically, the Court of Appeals pointed to the attorney's alleged "griming" of the sixteen-year old witness and failure to make a contemporaneous objection to the court's order. However, the Court of Appeals further reasoned that, even if counsel had not made these errors, the result of the proceeding would have been the same, because of the ample evidence presented to link Petitioner to the shooting. There is no error in the Court of Appeal's reasoning. Petitioner has not shown a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. He is not entitled to habeas relief on this issue.

**3.**

Petitioner argues that trial counsel was ineffective because he failed to thoroughly investigate the crime or identify other potential suspects, including prosecution witness Lewis. Petitioner first raised this claim in a motion for relief from judgment. The trial court denied relief because "all of the evidence defendant points to which he argues establishes his innocence was presented at trial." *People v. Williams*, No. 07-010617-02-FC, Wayne Cir. Ct. Opinion and Order at 2-3, 6 (July 23, 2013). The Michigan Court of Appeals also denied relief because Petitioner was alleging "grounds for relief that could have been raised previously" and "failed to establish both good cause for failing to previously raise the issues and actual prejudice from the irregularities alleged[.]" *People v. Williams*, No. 319908, Mich. Ct. App. Order (Feb. 27, 2014).

This claim is procedurally defaulted. Habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes,* 433 U.S. 72 (1977); *Couch v. Jabe,* 951 F.2d 94 (6th Cir. 1991). In *Wainwright,* the United States Supreme Court explained that a petitioner's procedural default in the state courts will preclude federal habeas review if the last state court rendering a judgment in the case rested its judgment on the procedural default. 433 U.S. at 85.

In such a case, a federal court must determine not only whether a petitioner has failed to comply with state procedures, but also whether the state court relied on the procedural default or, alternatively, chose to waive the procedural bar. "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed,* 489 U.S. 255, 263-64 (1989). The last explained state court judgment should be used to make this determination. *Ylst v. Nunnemaker,* 501 U.S. 797, 803-805 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id.*

Here, the Michigan Court of Appeals rendered the last reasoned opinion. In dismissing Petitioner's ineffective assistance of counsel claim, the court relied upon a state procedural bar—Michigan Court Rule 6.508(D)(3)—in denying relief. *See Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (referring to M.C.R. 6.508(D)(3) as the "procedural default rule."). Reliance upon Michigan Court rule 6.508(D)(3) is an "independent and adequate state ground sufficient for procedural default," requiring Petitioner to raise the claim during his direct appeal. *See, e.g., McFarland v. Yukins*, 356 F.3d 688, 698 (6th Cir. 2004).

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 753; *Gravley v. Mills,* 87 F.3d 779, 784-85 (6th Cir. 1996). Petitioner asserts that appellate counsel was ineffective for failing to raise this claim in the motion to remand. Attorney error can constitute cause to excuse a procedural default only if it rises to the level of constitutionally ineffective assistance of counsel under the standard set forth by the United States Supreme Court in *Strickland,* 466 U.S. 668. As set forth in Section III(E), below, appellate counsel was not constitutionally ineffective. Thus, Petitioner cannot establish cause to excuse his default. The Court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *See Smith v. Murray,* 477 U.S. 527, 533 (1986); *Long v. McKeen,* 722 F.2d 286, 289 (6th Cir. 1983).

Additionally, Petitioner has not established that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S. 298, 326-27 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 624 (1998). "To be credible, [a claim of actual innocence] requires petitioner to support his [or her] allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup,* 513 U.S. at 324. Petitioner has made no such showing. His ineffective assistance of counsel claim based on trial counsel's alleged failure to investigate is thus barred by procedural default and does not warrant habeas relief.

Even if the Court could excuse the procedural default, Petitioner would still not be entitled to relief. The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law to the facts. Well-established federal law requires that defense counsel conduct a reasonable investigation into the facts of a defendant's case, or make a reasonable determination that such investigation is unnecessary. *Wiggins*, 539 U.S. at 522–23; *Strickland*, 466 U.S. at 691; *Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning . . . guilt or innocence."); *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). Decisions as to what evidence to present and whether to call certain witnesses, however, are presumed to be matters of trial strategy. When making strategic decisions, counsel's conduct must be reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). The failure to call witnesses or present evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002). Here, Petitioner does not demonstrate that trial counsel's alleged failure to investigate other potential suspects deprived him of a substantial defense. As noted by the trial court, trial counsel actually *did* present evidence that someone else was driving the van during the Perfect Beat shooting. Two witnesses testified that the driver of the van was Mexican or Caucasian, and not African American like Petitioner. As stated by the trial court, "[d]efense counsel was able to bring out on cross-examination the conflicting identification testimony of the prosecution's eyewitness and presented evidence that defendant was not involved in the crime." *Williams*, No. 07-010617-02-FC at 3. Thus, Petitioner is not entitled to relief on this claim.

**D.**

Petitioner next argues that he is entitled to habeas relief because the complaint against him lacked probable cause, and therefore the district and circuit court lacked jurisdiction to proceed against him. The determination of whether a state court is vested with jurisdiction under state law over a criminal case is a function of the state courts, not the federal courts. *Wills v. Egeler,* 532 F. 2d 1058, 1059 (6th Cir. 1976). *See also Daniel v. McQuiggin,* 678 F.Supp. 2d 547, 553 (E.D. Mich. 2009). "A state court's interpretation of state jurisdictional issues conclusively establishes jurisdiction for purposes of federal habeas review." *Strunk v. Martin*, 27 F. App'x. 473, 475 (6th Cir. 2001). Petitioner's claim that the trial court lacked jurisdiction to try his case raises an issue of state law, and is therefore not cognizable in federal habeas review. *See Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986) (holding that the petitioner's claim that the trial court lacked jurisdiction was not cognizable on federal habeas review).

**E.**

Finally, Petitioner asserts that appellate counsel was ineffective in three ways. First, he argues that appellate counsel erred by failing to brief trial counsel's lack of objection to the courtroom closure. Second, he asserts that appellate counsel failed to raise trial counsel's failure to investigate the facts of the case in her motion to remand. Finally, Petitioner contends that appellate counsel was ineffective by failing to provide transcripts in time for him to prepare a Standard 4 Brief.

The *Strickland* standard also applies to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005). It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes,* 463 U.S. 745, 751 (1983). The United States Supreme Court has explained:

For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy . . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id*. at 754. Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry,* 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Barnes,* 463 U.S. at 751–52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards,* 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," which is defined as an issue which was obvious from the trial record and would have resulted in a reversal on appeal. *See Meade v. Lavigne,* 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Here, Petitioner has failed to show that appellate counsel's performance fell outside the wide range of professionally competent assistance by omitting the ineffective assistance of trial counsel claims that Petitioner raised for the first time in his post-conviction motion for relief from judgment. Petitioner's appellate counsel filed a claim of appeal and motion for remand, raising the following two claims: 1) Petitioner was entitled to a new trial on the basis of newly discovered ballistic evidence, and 2) the trial court violated Petitioner's right to a public trial by closing the courtroom and violated his Sixth Amendment right to confrontation by ordering Lewis to face the jury during his testimony. Petitioner has not shown that appellate counsel's strategy in presenting these two claims and not raising other claims was deficient or unreasonable. Moreover, the Court

of Appeals granted the motion to remand on the basis of newly discovered evidence, indicating that counsel's performance was not deficient.

Relatedly, the Court of Appeals concluded that Petitioner failed to demonstrate that, but for counsel's alleged failure to provide a timely copy of the trial transcripts to allow Petitioner to file a Standard 4 brief, the results of the appeal would have been different. This conclusion is reasonable, given that the claims Petitioner wished to raise were ultimately meritless. Because Petitioner's ineffective assistance of trial counsel claim is without merit, Petitioner is unable to show that appellate counsel's failure to raise this claim on his appeal of right was deficient, and thus fails to establish that he was denied the effective assistance of appellate counsel. *See Coleman v. Metrist,* 476 F. Supp. 2d 721, 733 (E.D. Mich. 2007).

## IV.

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted). In this case, reasonable jurists would not debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted. Therefore, the Court will deny a certificate of appealability. The Court will also deny permission

to appeal in forma pauperis because any appeal of this decision could not be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus, ECF No. 1, is **DENIED** and the matter is **DISMISSED**.

It is further **ORDERED** that a certificate of appealability and permission to appeal in forma pauperis are **DENIED**.

Dated: April 3, 2018                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge

<div style="border:1px solid black;">

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 3, 2018.

                              s/Kelly Winslow
                              KELLY WINSLOW, Case Manager

</div>